# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Piper Jaffray & Co.,                                    Civil No. 04-2922 (DWF/JSM)
a Delaware Corporation,

        Plaintiff and Counter Defendant,

v.                                                      **MEMORANDUM**
                                                        **OPINION AND ORDER**

SunGard Systems International, Inc.,
a Pennsylvania Corporation f/k/a
SunGard Treasury Systems, Inc.
d/b/a SunGard Trading Systems,

        Defendant and Counter Claimant.

---

Joseph W. Anthony, Esq., and Norman J. Baer, Esq., Anthony Ostlund & Baer, PA, and
Janel M. Dressen, Esq., Valspar Corporation, counsel for Plaintiff and Counter
Defendant.

Denis E. Grande, Esq., and Holly J. Newman, Esq., Mackall Crounse & Moore, PLC;
Brian S. Paszamant, Esq., Laurence S. Shtasel, Esq., and James T. Smith, Esq., Blank
Rome LLP; Erin A. Shields, Esq., and Joanne Horwood Turner, Esq., counsel for
Defendant and Counter Claimant.

---

## INTRODUCTION

This contract dispute is before the Court pursuant to a Motion for Partial Summary

Judgment brought by Plaintiff Piper Jaffray & Co. ("Piper").  In its First Amended

Complaint (the "Complaint"), Piper Jaffray alleges breach of contract and conversion.

Defendant SunGard Systems International, Inc. ("SunGard"), counterclaims for breach of

contract, unjust enrichment, and copyright infringement.  For the reasons set forth below,

the Court grants in part and denies in part Piper's motion.

# BACKGROUND

## The Parties' Agreement

Piper, a Delaware corporation with its principal place of business in Minneapolis, Minnesota, sells financial products and services, including brokerage services for the trading of fixed-income securities.  SunGard, a Pennsylvania corporation with its principal place of business in New York, New York, sells computer software products and services.  In March 2001, the parties executed a software license agreement (the "Agreement"), whereby SunGard granted Piper a license to use SunGard's Global Trader software and agreed to provide various services to Piper in conjunction with the license.[1]  In exchange, Piper agreed to pay SunGard an initial license fee, maintenance fees, service fees, expense reimbursements, and taxes.

## First Termination and Addendum to the Agreement

Piper alleges that SunGard failed to install Global Trader as anticipated.  Therefore, in February 2002, Piper gave notice of termination of the Agreement and commenced a lawsuit against SunGard in Minnesota state court.  During subsequent mediated negotiations, in September 2002, the parties agreed to execute an Addendum (the "Addendum"), which amended the Agreement.  SunGard alleges that prior to the execution of the Addendum, Piper had not paid SunGard the full license fees for either

---

[1]     The Agreement states that it shall be construed and enforced in accordance with Pennsylvania law.  (Newman Aff., Ex. 1 at § 10.16.)

(Footnote Continued on Next Page)

Global Trader or MINT (a separate software product) and owed hundreds of thousands of dollars for unpaid maintenance and professional service fees.

Pursuant to the Addendum, the parties agreed that the project described in the Agreement would be deemed restarted on September 16, 2002 (the "Project Restart Date").  Additionally, under the Addendum, SunGard agreed to provide a Production Ready Version ("PRV") of Global Trader within 120 calendar days from the Project Restart Date.  SunGard also agreed to waive certain claimed outstanding fees and modify certain fees on a going-forward basis.  SunGard's obligations and concessions under the Addendum were subject to Piper "moving forward toward going live with the Global Trader software in good faith and complying with its obligations under this Addendum and the Agreement."  (Aff. of Holly J. Newman ("Newman Aff."), Ex. 3 at ¶ 12.)  In the event that Piper failed to comply with its obligations under the Addendum, the Addendum provided that SunGard could seek to recover all fees, costs, and expenses otherwise waived by the Addendum.

SunGard contends that in February 2003, it delivered, and Piper accepted, the PRV.  Following Piper's acceptance of the PRV, SunGard recommenced invoicing Piper for maintenance fees rendered in connection with Global Trader, as set forth in the Addendum.  SunGard admits that Piper paid these invoices for the period from February 22, 2003, through June 30, 2003, but contends that Piper has not paid

(Footnote Continued From Previous Page)

maintenance fees since that time.  Additionally, SunGard contends that Piper has not paid SunGard for professional services rendered in connection with Global Trader since Piper's acceptance of the PRV.

**Proposed Addendum 2**

Piper contends that in Spring 2003, SunGard's project manager disclosed to Piper that Global Trader would not function as required and alleges that SunGard proposed to meet its obligations with an Internet version of Global Trader called eGT.  SunGard admits that in July 2003, it recommended to Piper that SunGard install eGT as an overlay to the GT implementation.  SunGard represented that it would install eGT with "no negative financial impact" to Piper.  (Aff. of Aaron R. Hartman in Supp. of Piper's Mot. for Partial Summ. J. ("Hartman Aff."), Ex. 41 at SC014043.)  The parties reached an oral agreement regarding eGT, under which Piper agreed to extend the duration of the license for Global Trader and pay an increased annual maintenance fee beginning January 1, 2004.  SunGard agreed to waive certain professional service fees generated during August and September 2003 and to waive annual maintenance fees until January 1, 2004.  Additionally, Piper contends that SunGard agreed that Gwenda Thompson, an employee of SunGard, would be provided as an on-site resource to Piper and that there would be no charge for her services for the first year following "go-live."  The parties negotiated another addendum ("Proposed Addendum 2") covering these terms, but ultimately reached only an oral agreement to modify the Agreement and Addendum.

In addition to discussing the Proposed Addendum 2, the parties also discussed

entering a Joint Marketing Agreement ("JMA") for the eGT software.  Specifically, the

parties discussed the possibility of Piper assisting SunGard's efforts to market the eGT

software in exchange for a share of the royalty payments SunGard would receive from

prospective customers.  Piper alleges that the JMA was SunGard's response to Piper's

expressed desire to recapture the $6 million in cost overruns Piper allegedly suffered in

connection with the Global Trader implementation.  Two weeks prior to the "go-live"

date, on or about October 7, 2003, Piper executive Mike Duffy inquired about SunGard's

intentions with respect to the Proposed Addendum 2 and the JMA.  SunGard executives

considered delaying the discussion regarding the Proposed Addendum 2 and the JMA

until after the "go-live" date.  In particular, SunGard's CEO, Cris Conde, stated in an

e-mail to other SunGard executives,

> seems to me that [Piper's] negotiating position weakens once they go live.
> If they don't go live no amount of discussion on royalties or discounts will
> save us.  Therefore the sensible response is to tell them that we're all
> focused on going live right now, could we get back to them with a proposal
> after that date?

(Hartman Aff., Ex. 55.)  Although the parties never signed the Proposed Addendum 2,

SunGard allegedly began to perform in accordance with this addendum on or about July

2003.  SunGard contends that Piper accepted SunGard's performance.

SunGard provided Piper with a version of the GT/eGT software, and on

October 27, 2003, Piper went "live" with the GT/eGT software.  SunGard contends that

Piper has utilized the GT/eGT software in its fixed income business since "going live" in

late October 2003.  SunGard contends that it provided Piper with maintenance for the

eGT software from August 1, 2003, to July 31, 2004.  Additionally, SunGard claims that

it has provided professional services to Piper with respect to implementation of eGT.

Despite SunGard's alleged delivery of the PRV in February 2003, and Piper's use of

GT/eGT since October 2003, SunGard contends that Piper has refused to pay SunGard

the license, maintenance, and professional fees that are due.

**Second Termination of the Agreement**

On October 18, 2004, SunGard provided Piper with written notice that Piper's

failure to pay outstanding invoices constituted a material breach of the Agreement and

advised Piper that failure to pay these outstanding invoices by November 17, 2004, would

result in SunGard terminating the Agreement.  Piper did not pay any of the outstanding

invoices by November 17, 2004.  On November 23, SunGard terminated the Agreement.

SunGard alleges that it terminated pursuant to § 9.2 of that Agreement, which provides

that SunGard may terminate the Agreement if Piper fails to cure a material breach of the

Agreement within 30 days of being given notice of such breach.  Further, SunGard

contends that Piper has continued to use SunGard's GT/eGT software and related

intellectual property in violation of § 9.3 of the Agreement.  That section provides, in

relevant part,

> Upon termination of this Agreement . . . Customer shall:  (a) discontinue all
> use of all affected Software and Documentation, (b) promptly return to
> SunGard all copies of the affected Software and Documentation and any
> other affected Proprietary Items then in Customer's possession, and (c) give
> written notice to SunGard certifying that all copies of the affected Software
> have been permanently deleted from its computers.

(Hartman Aff., Ex. 40 at § 9.3.)

**Procedural History of this Lawsuit**

In May 2004, Piper commenced this action in Minnesota state court, which

SunGard removed to this Court.  In its Amended Complaint, Piper asserts three claims:

(1) breach of the Addendum (Count I); (2) breach of the Agreement (Count II); and

(3) conversion (Count III).  Piper seeks total damages in excess of $5 million, including

consequential and incidental damages.  In its Amended Answer, Affirmative Defenses

and Counterclaims (the "Answer"), SunGard asserts four counterclaims:  (1) breach of the

Agreement (Count I); (2) unjust enrichment regarding the Agreement (Count II);

(3) unjust enrichment regarding the Proposed Addendum 2 (Count III); and (4) copyright

infringement (Count IV).  SunGard seeks damages in excess of $11.8 million.

SunGard subsequently brought a Motion to Dismiss, asserting that, by the terms of

the Agreement, Piper waived consequential and incidental damages, and SunGard's total

liability is capped at an amount less than $5 million.  In an Order dated September 30,

2004 (the "September 2004 Order"), the Court granted SunGard's motion regarding

consequential and incidental damages, but declined to address the contractual-cap issue.

In particular, the Court found that § 6.11 of the Agreement is valid and enforceable and

precludes Piper from recovering consequential and incidental damages.  Section 6.11

provides, in relevant part,

> **Consequential Damage Exclusion**.  . . . UNDER NO CIRCUMSTANCES
> SHALL EITHER PARTY BE LIABLE TO THE OTHER OR ANY
> OTHER PERSON FOR ANY INCIDENTAL, INDIRECT,

> CONSEQUENTIAL, SPECIAL, OR PUNITIVE DAMAGES OF ANY
> KIND OR NATURE, INCLUDING, SUCH DAMAGES ARISING FROM
> ANY BREACH OF THIS AGREEMENT OR ANY TERMINATION OF
> THIS AGREEMENT, WHETHER SUCH LIABILITY IS ASSERTED ON
> THE BASIS OF CONTRACT, TORT (INCLUDING NEGLIGENCE OR
> STRICT LIABILITY), OR OTHERWISE, . . .

(Hartman Aff., Ex. 40 at § 6.11.)

SunGard later brought a Motion for Partial Summary Judgment on Piper's claims

for direct damages in excess of the contractual-damage cap.  In an Order dated April 28,

2005 (the "April 2005 Order"), the Court granted SunGard's motion and found that § 6.10

of the Agreement, containing the damage cap, is valid and enforceable and precludes

SunGard's total liability from exceeding the initial license fees actually paid by Piper.

Section 6.10 provides, in relevant part,

> **Limitations**.  EXCEPT FOR . . . (iv) BREACHES BY CUSTOMER OF
> THE SCOPE OF LICENSE GRANTED HEREUNDER, WITH RESPECT
> TO EACH SOFTWARE SCHEDULE NEITHER PARTY'S TOTAL
> LIABILITY UNDER THIS AGREEMENT SHALL UNDER ANY
> CIRCUMSTANCES EXCEED THE INITIAL LICENSE FEES
> ACTUALLY PAID BY CUSTOMER TO SUNGARD UNDER THIS
> AGREEMENT WITH RESPECT TO SUCH SOFTWARE SCHEDULE.

(*Id.* at § 6.10.)

**Piper's Motion for Partial Summary Judgment**

Piper now brings this Motion for Partial Summary Judgment, asserting that

SunGard has overstated its damages.  In particular, Piper contends that SunGard is

precluded as a matter of law from seeking at least $8.4 million of the $11.8 million in

damages sought.  Piper relies on the Court's holdings in its September 2004 and April

8

2005 Orders in asserting that SunGard is not entitled to recover any damages in excess of the initial license fees paid by Piper to SunGard, except to the extent of Piper's payment obligations pursuant to the Agreement, nor may SunGard recover incidental, indirect, consequential, special, or punitive damages of any kind or nature.  Further, Piper contends that even if these limitations did not apply to SunGard, on the facts of this case, and as a matter of law, SunGard's damages can be no more than $3.41 million.

Specifically, Piper asserts that the Court should dismiss SunGard's claims for unjust enrichment and copyright infringement because, under § 6.11 of the Agreement, SunGard is not entitled to any extra-contractual damages.  Piper further contends that SunGard's unjust enrichment claims fail for alternative reasons.  First, Piper contends that SunGard is not entitled to recover under an unjust enrichment theory for breach of the Agreement (Count II) because, as a matter of law, SunGard may not recover for unjust enrichment where an express contract exists.  Second, Piper contends that SunGard is not entitled to recover eGT license fees, eGT annual maintenance fees, and fees for Gwenda Thompson's services (Count III) because the parties agreed that SunGard would provide eGT at no cost to Piper.

Additionally, Piper asserts that under the damage cap contained in § 6.10 of the Agreement, SunGard's total recoverable damages are limited to the actual amount of license fees that Piper paid to SunGard or such amount as SunGard can prove as a payment obligation under the express terms of the Agreement.  In particular, Piper asserts that SunGard's claim for various professional service fees must be reduced to the amount

9

for which there are work orders because, according to Piper, the Agreement expressly conditions Piper's obligation to pay professional service fees upon SunGard issuing, and Piper approving, a work order. Additionally, Piper contends that SunGard is not entitled to any of the damages it claims for "Maintenance Fees until delivery of PRV (1.5 years)" because, under the Agreement, SunGard is not entitled to maintenance fees until the scheduled installation date of the software, which Piper contends occurred in February 2003, the alleged delivery date of a production-ready version of Global Trader.

## DISCUSSION

### I.    Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences, which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the

record, which create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953,

957 (8th Cir. 1995).  A party opposing a properly supported motion for summary

judgment may not rely upon mere allegations or denials of his pleading, but must set forth

specific facts showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 256 (1986).

## II.    Copyright Infringement Claim (Count IV)

Piper asserts that SunGard's copyright infringement claim is excluded under § 6.11

of the Agreement.  That section provides, in relevant part:

> **Consequential Damage Exclusion** . . . UNDER NO CIRCUMSTANCES
> SHALL EITHER PARTY BE LIABLE TO THE OTHER OR ANY
> OTHER PERSON FOR ANY INCIDENTAL, INDIRECT,
> CONSEQUENTIAL, SPECIAL, OR PUNITIVE DAMAGES OF ANY
> KIND OR NATURE, INCLUDING, SUCH DAMAGES ARISING FROM
> ANY BREACH OF THIS AGREEMENT OR ANY TERMINATION OF
> THIS AGREEMENT, WHETHER SUCH LIABILITY IS ASSERTED ON
> THE BASIS OF CONTRACT, TORT (INCLUDING NEGLIGENCE OR
> STRICT LIABILITY), OR OTHERWISE, . . .

(Hartman Aff., Ex. 40 at § 6.11.)  Piper contends that SunGard's copyright infringement

claim arises from Piper's alleged breach or termination of the Agreement and Addendum,

and should therefore be dismissed because § 6.11 delineates that no damages are

recoverable for this claim.  Piper further points out that the Court, in its September 2004

Order, held that § 6.11 is valid and prohibits Piper from recovering any extra-contractual

damages.

In response, SunGard asserts that § 6.11 does not preclude its copyright

infringement claim because, according to SunGard, that claim arises outside of the

Agreement.  In support of this assertion, SunGard contends that it does not seek damages from the breach and termination of the Agreement, but rather for Piper's "continued, unlicensed use of SunGard's intellectual property (the GT/eGT software), during the time-period following termination of [the Agreement] on November 23, 2004."  (Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. ("Mem. in Opp'n") at 13.)  SunGard further contends that because Piper allegedly failed to comply with § 9.3 of the Agreement by discontinuing use of the GT/eGT software, SunGard is permitted to bring its claim for copyright infringement.

Additionally, SunGard contends that its copyright infringement claim should not be excluded under § 6.11 because, under that claim, SunGard seeks direct damages, which § 6.11 does not bar.  SunGard contends that it seeks direct damages "in the form of profits earned by [Piper] as a direct result of its unlicensed and infringing use of the GT/eGT software."  (*Id.* at 16.)  SunGard contends that Piper misinterprets the plain language of the Agreement by asserting that § 6.11 bars claims seeking extra-contractual damages of any kind or nature.   Further, SunGard contends that the direct damages it seeks in its copyright infringement claim are excluded from the damages cap of § 6.10.  That section provides, in relevant part:

> **Limitations**.  EXCEPT FOR . . . (iv) BREACHES BY CUSTOMER OF THE SCOPE OF LICENSE GRANTED HEREUNDER, WITH RESPECT TO EACH SOFTWARE SCHEDULE NEITHER PARTY'S TOTAL LIABILITY UNDER THIS AGREEMENT SHALL UNDER ANY CIRCUMSTANCES EXCEED THE INITIAL LICENSE FEES ACTUALLY PAID BY CUSTOMER TO SUNGARD UNDER THIS AGREEMENT WITH RESPECT TO SUCH SOFTWARE SCHEDULE.

12

(Newman Aff., Ex. 1 at § 6.10.)

The Court rejects SunGard's assertions.  First, the Court finds that SunGard's copyright infringement claim arises from the Agreement.  In its Answer, SunGard claims that it lawfully terminated the Agreement because Piper allegedly failed to pay money due under that Agreement and that Piper allegedly breached its post-termination obligations under § 9.3 of the Agreement to stop using the software and return it. (Answer at ¶¶ 29-31, 44, 58–59.)  Based on these claims, the Court finds that SunGard's copyright damages are subject to the Agreement, including the damage cap imposed by § 6.10.  Further, § 6.10's specific exclusions do not include breach of the post-termination provision of § 9.3—the alleged breach that gives rise to SunGard's copyright claim. Accordingly, the Court finds that any copyright infringement damages are subject to the Agreement.

Further, the Court finds that the damages SunGard seeks are not direct damages and are therefore barred under § 6.11.  SunGard alleges that it seeks direct damages "in the form of profits earned by [Piper] as a direct result of its unlicensed and infringing use of the GT/eGT software."  (Mem. in Opp'n at 16.)  The Copyright Act states that the "copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing actual damages."  17 U.S.C. § 504(b).  With regard to the infringer's profits, cases distinguish between the infringer's

direct or indirect profits. *See Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 795 (8th Cir. 2003). Direct profits involve selling the copyrighted work while indirect profits involve using the copyrighted work to sell another product. *Id.* at 796. Here, SunGard does not assert any actual damages; rather, SunGard seeks profits of the alleged infringer. Regarding Piper's alleged profits, SunGard does not allege that Piper has sold SunGard's copyrighted software. Therefore, SunGard's copyright claim is limited to Piper's indirect profits. The Court finds that the damages SunGard seeks are not direct damages: even if it can prove infringement, SunGard would only be entitled to recover Piper's indirect profits. Piper's indirect profits cannot constitute direct damages to Piper. Thus, the Court finds that these alleged indirect losses are barred under § 6.11 of the Agreement.

**III.    Unjust Enrichment Claim for Products and Services Relating to the Implementation of Global Trader (Count II)**

Next, Piper asserts that SunGard's unjust enrichment claim for products and services relating to the implementation of Global Trader inarguably arises from Piper's alleged breach or termination of the Agreement and Addendum and should therefore be dismissed because § 6.11 of the Agreement bars damages for this claim. The Court agrees and dismisses this claim on the basis of § 6.11 of the Agreement.[2] Alternatively, Piper asserts that even if the Agreement did not expressly bar all extra-contractual damages, SunGard's unjust enrichment claim found in Count II fails as a matter of law because the parties' relationship is governed by an express contract. Piper cites

14

Pennsylvania and Minnesota case law, which holds that a party cannot recover on a claim for unjust enrichment if such claim is based on a breach of an express contract.  *See Birchwood Lakes Cmty. Ass'n, Inc. v. Comis*, 442 A.2d 304, 308 (Pa. Super. 1982); *Sharp v. Laubersheimer*, 347 N.W.2d 268, 271 (Minn. 1984).

SunGard does not dispute that, ultimately, it is not permitted to bring an unjust enrichment claim where an express contract exists.  Rather, SunGard contends that Piper's request to dismiss Count II is premature because the Court may, at a later date, dismiss the contract action by finding the Agreement invalid.  The Court disagrees.  Here, the parties have both alleged and admitted the validity of the Agreement.  Thus, because the parties agree that that their relationship is governed by a valid, express contract, the Court finds that SunGard's unjust enrichment claim under Count II must be dismissed as a matter of law.

---

(Footnote Continued From Previous Page)
[2]       SunGard does not respond to this assertion.

**IV.    Unjust Enrichment for Fees and Expenses Relating to SunGard's
        Implementation of eGT (Count III)**

Next, Piper asserts that SunGard's claims for unjust enrichment for fees and

expenses relating to SunGard's implementation of eGT (Count III) inarguably arise from

Piper's alleged breach or termination of the Agreement and Addendum.  Therefore,

according to Piper, pursuant to § 6.11 of the Agreement, SunGard is precluded from

recovering damages for this claim.  In response, SunGard asserts that its unjust

enrichment claim (Count III) is not governed by the Agreement.  The Court disagrees.

Here, the evidence shows that the Proposed Addendum 2 was intended to modify the

Agreement and Addendum.   Thus, the Court finds that SunGard's claims for fees related

to the eGT license are governed and restricted by the terms of the Agreement and

Addendum.   Alternatively, Piper contends that SunGard is not entitled to eGT license

and maintenance fees and fees for services rendered by Thompson because SunGard

agreed to provide these products and services for no charge.  The Court will address each

of these assertions in turn.

**A.    License and Maintenance Fees for eGT**

SunGard claims that it is entitled to $5,058,750 in damages for an eGT license fee

and $1,011,750 in damages for an eGT annual maintenance fee.  Piper asserts that, as a

matter of law, SunGard is not entitled to either of these items of damages.  To establish a

cause of action for unjust enrichment, it must be shown that a party has "knowingly

received something of value, not being entitled to the benefit, and under circumstances

that would make it unjust to permit its retention."[3] *Southtown Plumbing, Inc. v. Har-Ned Lumber Co., Inc.*, 493 N.W.2d 137, 140 (Minn. Ct. App. 1992); *see also Schumacher v. Schumacher*, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001).  "The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff."  *AmeriPro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa. Super. 2001); *see also Schumacher*, 627 N.W.2d at 729 (holding that in order to establish an action for unjust enrichment, "it must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully.") (citation omitted).

Piper contends that SunGard is not entitled to these items of damages because: (1) in its pleadings, SunGard admitted that it agreed to provide Piper with the eGT software at no cost; and, alternatively, (2) the undisputed evidence proves that SunGard made a conscious decision to provide Piper with eGT at no cost.  Piper further asserts that because SunGard agreed to provide eGT at no cost, it has no basis to claim that Piper was unjustly enriched by receiving these licenses.  In response, SunGard asserts that disputed issues of material fact exist regarding SunGard's claim of unjust enrichment for eGT and therefore preclude summary judgment.

The Court first examines whether SunGard admitted in its pleadings that it agreed to provide Piper with the eGT software at no cost.  In its Answer, SunGard stated,

---

[3]     Piper cites both Minnesota and Pennsylvania law.  The Court finds that the result

(Footnote Continued on Next Page)

> Under [Proposed] Addendum 2, the parties agreed to extend the license for Global Trader, and to increase the annual maintenance fee charged for Global Trader effective January 1, 2004.  SunGard agreed to credit the February 22, 2003 through June 30, 2003 maintenance fees paid by Piper Jaffray against outstanding professional services fees incurred pursuant to the License Agreement.  SunGard agreed to waive certain professional services fees generated during August and September 2003.  Additionally, SunGard agreed to provide Piper Jaffray with 330 user licenses for its [eGT] software application . . . at no cost.

(Answer at ¶ 21.)  SunGard contends that this paragraph makes clear that Piper allegedly made concessions that were the quid pro quo for SunGard's agreement to provide eGT software at no additional cost.  SunGard contends that it pleaded that the financial concession regarding eGT license was bargained-for in exchange for Piper agreeing to extend its Agreement and increase the amount of maintenance fees as of January 1, 2004.  The Court disagrees and finds that SunGard's pleading constitutes an admission that, as a matter of law, SunGard agreed to provide eGT software at no additional cost.

Next, the Court examines whether the evidence proves that SunGard made a conscious decision to provide Piper with eGT at no cost.  Piper cites several pieces of evidence.  First, when SunGard presented Piper with the eGT for traders solution on June 30, 2003, SunGard stated that the change to eGT would result in "no negative financial impact."  (Hartman Aff., Ex. 41, Dep. Ex. 5 at SG014043.)  Second, SunGard witnesses have testified that eGT was to be provided to Piper at no additional cost and that there was no discussion about the possibility that Piper would pay any eGT license

_____

(Footnote Continued From Previous Page)
is the same using either State's law.

fee.  (*See* Hartman Aff., Ex. 37 at 138, Ex. 38 at 184.)  For example, David Jeffers

testified that, "I believe in the draft [Proposed Addendum 2] that I sent, there was

language that included eGT in the standard license agreement.  There was no dollar

amount affixed to that."  (Hartman Aff., Ex. 35 at 30–31.)  Third, had Piper been asked to

pay eGT license or maintenance fees, it would have refused.  (Decl. of Barry Nordstrand

("Nordstrand Decl.") at ¶ 3.)  Given that SunGard agreed to provide eGT licenses at no

cost, Piper contends that SunGard has no basis to claim that by receiving these licenses,

Piper was unjustly enriched.

Piper further alleges that SunGard only changed its mind after Piper initiated this

lawsuit, which was after SunGard had already installed eGT and after Piper had

integrated eGT into its daily business operations.  In fact, Piper notes that SunGard never

invoiced it for eGT until after Piper filed its Complaint in May 2004.  In response,

SunGard contends that Piper misconstrues the evidence.  In particular, SunGard contends

that the testimony of SunGard's witnesses clearly confirms that any financial concessions

were made pursuant to SunGard's reasonable belief that Piper would execute the

Proposed Addendum 2, which required Piper to make concessions to SunGard.  In

support of this assertion, SunGard points to Stephen Butcher's testimony in which he

stated,

> Offering e-GT as part of [Proposed] Addendum 2 and not assigning any
> specific costs to the E-GT software should not—is not and was not part of
> a—was not something that you could extract from this addendum.  At this
> time Piper Jaffray owed substantial sums of money in other areas, which
> were not being paid, and this addendum was put in place to resolve all of

the issues from both sides—both parties' sides such that Piper Jaffray got what was most suitable for their needs and that SunGard got what was most suitable for their requirements.

(Newman Aff., Ex. 7 at 121.)  SunGard further asserts that Piper disregards the facts by contending that it manufactured invoices for the eGT license fee after Piper initiated this lawsuit.  In particular, SunGard points to David Jeffers' Affidavit in which he states that until Piper initiated this lawsuit, SunGard believed that Piper was going to execute the Proposed Addendum 2 to the Agreement, which would have obligated Piper to an extension of the term of the Agreement and to pay increased maintenance fees effective January 1, 2004.  Jeffers further stated that once it became clear that Piper was not going to execute the Proposed Addendum 2, SunGard invoiced Piper for relevant eGT license, maintenance, and professional fees.

Viewing the evidence in the light most favorable to SunGard, the Court finds that SunGard cannot meet the elements of an unjust-enrichment claim for license and maintenance fees for eGT as a matter of law.  Here, the evidence shows that SunGard made a conscious decision to provide eGT without charge.  Numerous SunGard witnesses testified that SunGard provided eGT to Piper at no cost.  Further, the evidence shows that at Piper's initiation of this lawsuit, SunGard changed its mind.  Now, SunGard requests more than it could have gotten if the negotiations had been completed.  Further, the record reveals that SunGard "deliberately failed" to complete the Proposed Addendum 2 negotiations.  In particular, in response to Piper's inquiries about executing the Proposed Addendum 2 and JMA, SunGard's CEO, Conde, stated in an e-mail to other SunGard

executives, that Piper's "negotiating position weakens once they go live" and suggested that SunGard delay getting back to Piper regarding Proposed Addendum 2 and JMA. (Hartman Aff., Ex. 55.)

Alternatively, even if SunGard were able to prove an unjust enrichment claim, SunGard can recover no more than the value of the GT license extension and maintenance fee increase.[4] Here, Proposed Addendum 2 was intended to be a modification of the Agreement; therefore, damages related to the Proposed Addendum 2 are necessarily subject to the § 6.10 damages cap and the § 6.11 consequential-damages exclusion. Accordingly, the Court finds that SunGard is not entitled to the $5,058,750 in damages it claims for an eGT license fee and the $1,011,750 in damages it claims for an eGT maintenance fee.

### B.   Professional Services Fees for Gwenda Thompson

---

[4]   Piper contends that SunGard's eGT annual maintenance fee claim fails for the additional reason that the maintenance fee invoice bills Piper for services that SunGard never rendered and for services already billed to Piper.  In particular, the June 3, 2004 invoice provides that the amounts owing are for maintenance services to be rendered prospectively, between August 1, 2004, and July 31, 2005.  Piper contends that those services were never provided.  In response, SunGard agrees.  SunGard explains that due to a typographical error, SunGard invoiced Piper for eGT maintenance fees for the period between August 1, 2004, and July 31, 2005.  SunGard explains that the actual time period for which SunGard is owed eGT maintenance fees is August 1, 2003, to July 31, 2004, and contends that SunGard has rectified this mistake in a new invoice.  Thus, the Court need not address this issue.  Piper also claims that although SunGard's eGT maintenance fee claim begins August 1, 2004, SunGard had also submitted separate maintenance support invoices for the period from July 1, 2004, through September 30, 2004.  Piper contends that SunGard has duplicated the eGT maintenance fee claim for this limited time period.

(Footnote Continued on Next Page)

Piper also contends that SunGard is not entitled to any payment for Gwenda Thompson's services.  SunGard claims a right to payment of $407,062.50 for services rendered by Gwenda Thompson between September 28, 2003, and August 31, 2004, pursuant to its unjust enrichment claim.  Piper contends that because SunGard's witnesses testified that Thompson's services were rendered in connection with the unsigned Proposed Addendum 2, SunGard's claim fails for the same reasons as the other alleged unjust enrichment damages.  Additionally, Piper contends that the record does not support SunGard's claim for damages arising out of Thompson's services because any "enrichment" to Piper was not "unjust."  The Court agrees.

Here, the evidence shows that Piper and SunGard agreed in the latter half of 2003 that Thompson's services would be provided to Piper at no cost.  In particular, Farid Tamaddon, a SunGard employee, sent an e-mail to Piper employees on September 29, 3003, which states, "Gwenda is hired on a contract basis till [sic] December 1st, she will be full time after 1st and will be 100% dedicated to Piper for ongoing support."  (Hartman Aff., Ex. 50.)  Further, when questioned about this e-mail, Tamaddon testified that Thompson's services were to be at SunGard's expense.  (Hartman Aff., Ex. 38 at 205-06.) Despite this agreement, after Piper initiated this lawsuit, SunGard billed Piper for Thompson's services for the period of September 28, 2003, to August 31, 2004—the year after "go live."  On this evidence, the Court finds that SunGard's claim for damages

(Footnote Continued From Previous Page)

arising out of Thompson's services should be dismissed.  Accordingly, the Court finds that SunGard's damages for "Additional Invoices for Support, Development, and other items" should be reduced by the charges for Thompson's services, from $602,081 to $195,018.50.

## V.      Maintenance Fees for Periods Prior to February 2003

Next, Piper contends that SunGard is not entitled to recover any maintenance fees for periods prior to February 2003.[5]  Section 5.2 of the Agreement provides that Piper shall pay SunGard maintenance fees "[b]eginning on the Scheduled Installation Date."  (Hartman Aff., Ex. 41, § 5.2.)  When the parties signed the Agreement, they agreed to determine a "mutually acceptable project schedule in which an Installation Date will be specified," and further agreed that "[i]n no event will this date be more than 90 calendar days from the date of execution of the Agreement."  (*Id.* at Part A, p. 3.)  The parties, however, did not specify a scheduled installation date.  Piper contends that SunGard is not entitled to maintenance fees until February 2003 because it cannot

---

[5]      Although § 6.10 includes a damage cap, it excludes damages for a customer's payment obligations.  Specifically, § 6.10 states,

> **Limitations**.  EXCEPT FOR . . . CUSTOMER'S **PAYMENT OBLIGATIONS** HEREUNDER . . . NEITHER PARTY'S TOTAL LIABILITY UNDER THIS AGREEMENT SHALL UNDER ANY CIRCUMSTANCES EXCEED THE INITIAL LICENSE FEES ACTUALLY PAID BY CUSTOMER TO SUNGARD UNDER THIS AGREEMENT . . .

(Newman Aff., Ex. 1 at § 6.10 (emphasis added).)

demonstrate that it installed the software as required by Part A of the Agreement until that date.  Schedule A of the Agreement provides that SunGard shall provide components of the Global Trader software, including Global Trader Network Director, Database Server, DEE Interface, ODBC Interface, Ticker Server, and Administration Console.  (Newman Aff., Ex. 3 at Schedule A.)  Accordingly, Piper asserts that SunGard's claim should be reduced by $775,000.

Piper contends that during negotiations of the Addendum in September 2002, SunGard agreed to "Waive any Maintenance fees" incurred prior to delivery of PRV and that maintenance fees will begin with delivery of the Production Ready Version ("PRV").  (Hartman Aff., Ex. 39 at ¶¶ 3, 5.)  Further, SunGard project manager, Paul Moffat, testified that Piper's required "functionality" existed in the Global Trader ("GT") software in September 2002, but could not be delivered until SunGard performed the appropriate "configuration" work to the software.  (Hartman Aff., Ex. 36 at 19–20.)  And Moffat testified that SunGard "delivered PRV in February 2003.  (*Id.* at 24.)  Piper explains that, consistent with its purported "installation" of the software, SunGard first sent maintenance invoices to Piper in March and April 2003.

In response, SunGard contends that it is entitled to recover maintenance fees from July 2001 through February 2003, because it allegedly installed the GT software, complete with functionality, in May 2001.  In support of this assertion, SunGard contends that it provided Piper with version 3.09 of the Global Trader software in May 2001.  SunGard relies on Moffat's testimony, in which he stated that by May 2001, "[c]ertainly

we had signed off specification for the 3.09 software deliverable, which was a major

component of the analysis being completed, and I believe at that point we felt we

understood what the configuration was going to be."  (Newman Aff., Ex. 2 at 31.)

SunGard also contends that the parties agreed that functionality would "evolve"

throughout the Global Trader project and contends that its May 2001 Global Trader

software delivery met Piper's requirements at that time.  SunGard further points to

Moffat's testimony, in which he stated,

> But remember also that the Piper project was always intended to be a
> phased delivery.  We were not going to analyze everything all up front,
> know what everything was that we were going to do, and then deliver it in
> one piece.  The contract is very clear about that, and the entire project was
> very clear that there would be an initial delivery of the software, there
> would be another delivery of the software, another delivery of the software,
> and there were going to be continual phased deliveries of new functionality
> over the life of the project.

(Newman Aff., Ex. 2 at 32.)

Further, SunGard contends that Piper's assertion that "installation" of the GT

software coincided with the delivery of the PRV is misguided and incorrect.  In particular,

SunGard contends that, rather than constituting the initial "installation" of the Global

Trader software, PRV was to be an enhancement of the previously installed Global Trader

software.  Further, SunGard contends that the functionality required for the PRV went

well beyond the requirements for initial "installation" of the Global Trader software.

Viewing the evidence in the light most favorable to SunGard, the Court finds that a

genuine issue of material fact exists regarding when SunGard installed the Global Trader

software.  Here, Moffat testified that in May 2001 SunGard provided Piper with version 3.09 of the software, which included functionality.  Viewing Moffat's testimony in the light most favorable to SunGard, the Court cannot say that, as a matter of law, SunGard did not deliver the Global Trader software, as specified in Schedule A of the Agreement, until February 2003.  In conclusion, the Court denies Piper's request for summary judgment on SunGard's claim for damages for maintenance fees for periods prior to February 2003.[6]

## VI.   Professional Services

Finally, Piper asserts that SunGard cannot recover $1,146,500 of its claims for unpaid professional services, because no work orders were prepared and executed in connection with these services.  To establish an action for breach of contract under Pennsylvania law, a party must demonstrate the existence of a contract, a breach of a duty imposed by the contract, and damages.  *J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc.*, 792 A.2d 1269, 1272 (Pa. Super. 2002).  The interpretation of a contract is a question of law.  *Profit Wize Mktg. v. Wiest*, 812 A.2d 1270, 1274 (Pa. Super. 2002).  When a court interprets the language of a contract, the Court gives paramount consideration to the parties' intention.  *Thomas Rigging & Constr. Co., Inc. v. Contraves,*

---

[6]    The Court, however, notes that the evidence shows that Global Trader implementation was suspended during part of the time SunGard claims entitlement to maintenance fees.  Specifically, the project was suspended from October 2001 to September 2002.  Therefore, even if SunGard installed the GT software in May 2001, it did not provide maintenance during the period when implementation was suspended.

*Inc.*, 798 A.2d 753, 755 (Pa. Super. 2002).  When the contract contains clear and

unambiguous terms, the court need only examine the writing itself to give effect to the

parties' intent.  *Osial v. Cook*, 803 A.2d 209, 213 (Pa. Super. 2002).

Piper contends that SunGard's claim for unpaid professional services fails because

SunGard cannot show that it complied with § 3.3 of the Agreement.  That section

provides, in relevant part,

> **Professional Services**.  At Customer's reasonable request and subject to the
> availability of SunGard's personnel, SunGard shall provide to Customer
> consulting services, custom modification programming, support services
> relating to custom modifications, assistance with data transfers, system
> restarts and reinstallations, and other specialized support services with
> respect to the Software.  These services shall be provided by SunGard at
> Customer locations(s) if and when SunGard and Customer agree that on-site
> services are necessary.
>
> (a)     Work Orders.  Customer and SunGard shall execute Work Orders
>          indicating as applicable, the specifications, deliverables, delivery
>          schedule and cost for each such professional services project.

(Hartman Aff., Ex. 40 at § 3.3.)  Piper contends that SunGard failed to produce any work

order to support $1,146,500 of its claim for professional services fees.  Piper notes that

SunGard has produced no work orders for $846,500 in pre- and post- "go-live" consulting

services, for which SunGard invoiced Piper in May and June of 2004—only after Piper

filed its Complaint in this lawsuit.  Additionally, Piper contends that SunGard has no

work orders or even invoices for the $300,000 it seeks in "Estimated value of

Professional Services provided at no cost."  Because SunGard has not produced any work

orders for those services, Piper contends that the Court should strike SunGard's claimed

27

damages for pre- and post- "go-live" consulting and its "estimated" professional services provided at no cost.

Alternatively, Piper contends that even if the Agreement does not require an accepted work order as a prerequisite to payment for professional services, SunGard has admitted in its Answer that, under the Addendum, "SunGard agreed to waive certain professional services fees generated during August and September 2003."  (Answer at ¶ 21.)  Further, Piper alleges that in addition to agreeing to waive certain professional service fees generated during August and September 2003, Piper also agreed to waive professional service fees for October 2003.  In support of this assertion, Piper points to Tamaddon's deposition testimony, in which Tamaddon stated that Piper would not have to pay professional services for October 2003 because "the spirit of the agreement was we [SunGard] will do free professional services until they go-live."  (Hartman Aff., Ex. 38 at 97–98.)  Piper asserts that, at the very least, the Court should reduce SunGard's damages by $611,343.75—the fees billed for pre- "go-live" consulting services.

In response, SunGard asserts that neither the Agreement nor the Addendum requires a work order for SunGard to receive professional services fees.  SunGard points out that § 5.3 of the Agreement states, in relevant part,

> **Service Fees**.  Customer shall pay to SunGard the service fees as indicated in the Software Schedules hereto for . . . consulting services, custom modification programming, support services relating to custom modifications, assistance with data transfers, systems restarts and reinstallations, and other specialized support services under Section 3.3.

(*Id.* at § 5.3.)  SunGard contends that a correct reading of sections 5.3 and 3.3 does not

28

support the conclusion that Piper's payment obligations are conditioned upon an executed work order.  SunGard acknowledges that § 3.3 states that work orders *shall* be executed, but contends that this requirement does not predicate the offering or acceptance of professional services upon work orders.  Further, SunGard contends that the Agreement does not state that professional services requested by Piper and performed by SunGard will be free of charge in the absence of an executed work order.

Additionally, SunGard explains that there were no work orders nor invoices for $300,000 in damages for "Estimated value of Professional Services provided at no cost," because the fees were initially waived under the Addendum, in exchange for Piper upholding its obligations thereunder.  Further, SunGard contends that Piper's alleged failure to fulfill its obligations under the Addendum and Agreement permitted SunGard to seek payment for services provided under the Addendum.  SunGard contends that under such circumstances, the Addendum directed that Piper "shall not maintain that SunGard's claims in this respect are barred by this Addendum and/or the Agreement."  (Newman Aff., Ex. 3 at ¶ 12.)  Alternatively, SunGard contends that even if the Agreement originally required work orders, the parties' course of conduct modified the Agreement such that work orders were not required for professional services.

Reading sections 3.3 and 5.3 together, the Court finds that the Agreement unambiguously provides that the parties shall execute work orders in connection with professional services rendered by SunGard to Piper.  To hold otherwise would render the word "shall" meaningless.  *See Cranberry Park Assoc. ex rel. Viola v. Cranberry Twp.*

*Zoning Bd.*, 751 A.2d 165, 167 (Pa. 2000) (stating that the word "shall" is defined as "must").  Having concluded that the Agreement requires the parties to execute work orders for professional services, the Court next addresses SunGard's assertion that the parties modified the Agreement by the conduct.

A written contract can be modified by subsequent oral agreement or by subsequent conduct.  *Penn Mut. Life Ins. Co. v. Bank of New England Corp.*, 756 F. Supp. 856, 858 (E.D. Pa. 1991).  But "when the contract explicitly says that modifications must be in writing, there is a substantial barrier to one seeking to show modification by subsequent conduct."  *Id.*  Here, the Agreement expressly prohibits modifications unless in writing.  Specifically, § 10.8 provides,

> **Modification and Waiver**.  No modification or amendment of this Agreement, and no waiver of any breach of this Agreement, shall be effective unless in writing and signed by a duly authorized representative of each party hereto.  No waiver of any breach of this Agreement, and no course of dealing between the parties, shall be construed as a waiver of any subsequent breach of this Agreement.

(Hartman Aff., Ex. 40 at s 10.8.)

Pennsylvania courts have used different standards to determine whether a contract that provides that it can only be modified in writing is modified by subsequent conduct or not.  *Id.*  For example, the court in *Nicolella v. Palmer*, 248 A.2d 20, 23 (Pa. 1968), stated that, "where the writing contains an express provision that it constituted the entire contract between the parties and should not be modified except in writing, the party seeking to show subsequent oral modification in the agreement must prove it by clear,

precise, and convincing evidence, as in cases where fraud, accident, or mistake is

alleged." *See also First Nat'l  Bank of Pennsylvania v. Lincoln Nat'l Life Ins. Co.*, 824

F.2d 277, 280 (3d Cir. 1987) (adopting this test).  Additionally, the court in *Universal*

*Builders, Inc. v. Moon Motor Lodge, Inc.*, 430 Pa. 550, 244 A.2d 10 (1968), stated that

"[o]bviously a condition is considered waived when its enforcement would result in

something approaching fraud."  (Citation omitted.)  Finally, courts have followed a

two-step analysis, whereby the court first checks to see if there was any intent to waive

the contract requirement that all modifications be in writing, and then, only if there was,

examines the conduct of the parties to see if there was a waiver of the performance

required by the contract.  *Penn Mut. Life Ins. Co. v. Bank of New England Corp.*, 756 F.

Supp. 856, 858–59 (E.D. Pa. 1991) (citing *Douglas v. Benson*, 439 A.2d 779, 783 (Pa.

Super. 1982)).

At this time, SunGard has not met its burden under any of these tests.  SunGard

contends that it needs to complete discovery before summary judgment can be considered

on this issue.  SunGard believes that the completion of discovery will show that the

parties engaged in a course of conduct whereby Piper requested and SunGard provided

professional services without work orders and that the parties never refused to accept or

provide professional services where a work order was not executed.  Although discovery

has not been completed, SunGard has access to its own employees who worked on the

project.  The Court questions why SunGard has not provided sworn testimony from

SunGard's employees indicating that Piper and SunGard agreed to waive the

Agreement's work-order requirement.  If such an agreement existed, someone from SunGard must be able to provide evidence of that agreement.  Nevertheless, the Court finds that making a determination regarding whether parties intended to modify the Agreement's work-order requirement would be premature at this time.

Although the Court finds that SunGard is entitled to complete discovery on this issue before the Court will consider granting summary judgment, the Court does, however, find that, at a minimum, SunGard is not entitled to $611,343.75 in damages for fees billed for pre- "go-live" consulting services.  The Court finds that even if the Agreement does not require an accepted work order as a prerequisite to payment for professional services, SunGard has admitted in its Answer that under the Addendum it agreed to waive certain professional services fees generated during August and September 2003.  And the evidence shows that SunGard agreed to waive professional service fees for October 2003.  Thus, the Court finds that, as a matter of law, SunGard is not entitled to $611,343.75 in damages claimed for professional fees from August though October 2003.  In conclusion, the Court grants in part and denies in part Piper's request for summary judgment regarding SunGard's claimed damages for professional services.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED THAT:**

1.      Plaintiff's Motion for Partial Summary Judgment (Doc. No. 137) is **GRANTED IN PART and DENIED IN PART** as follows:

a.      The Court **GRANTS** Plaintiff's Motion with regard to

SunGard's copyright infringement claim (Count IV), unjust enrichment

claim for products and services relating to the implementation of Global

Trader (Count II), and unjust enrichment for fees and expenses relating to

SunGard's implementation of eGT (Count III).

b.      The Court **GRANTS IN PART and DENIES IN PART**

Plaintiff's Motion with regard to fees for professional services.

c.      The Court **DENIES** Plaintiff's Motion with regard to

maintenance fees for periods prior to February 2003.


Dated:  February 16, 2007          s/Donovan W. Frank
                                   DONOVAN W. FRANK
                                   Judge of United States District Court